IN THE UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE AT WILMINGTON

Richard Adjei )
      Movant )
     )
    V )     Docket # 06-55-GMS
     )
United States of America )
      Respondent )
     )

FILED

MAY - 4 2007

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

Violation of Rule 35(a) of the Federal Rules of Criminal Proceedures

COMES NOW the Movant Richard Adjei Acting pro-se moves the Honorable Court to GRANT this motion for the following reason(s).

1) Defendant's is filing this motion on 4/30/07. The Judgement of Sentence was entered on April 23, 07, therefore the movant is not time barred. Movant placed this motion in the mail 4/30/07. See Attached Certificate of Service.

2) Movant was charged with Aggravated Identity Theft 18 USC § 1028A) And received seventy five months As punishment AND BANK Fraud 18 U.S.C § 1344 - Total punishment of 75 months.

3) The Movant did not receive benefits from giving the government information on other people. Please See Exhibit A - Plea Agreement Page 8 starting at 14-A And ending on page 9.

4) Movant gave the government valuable information on Danyell Williams. Ms. Williams has been arrested and AUSA Beth Moscow-Schnell told Movant herself that his information was good. Yet the AUSA did <u>not</u> file for a 5K1.1 in behalf of the Movant denying Movant benefits from his substanial assistance, and violating the <u>PLEA AGREEMENT</u>

5) Please See Exhibit B and the Honorable Court can See the Assistance that was provided by Movant

6) Please See Exhibit C Additional assistance to the government

7) The Movant believes that the government should be forced to keep the plea agreement and the AUSA should submit a 5K1.1 motion to the Court and the Movant should receive the benefits of a 5K1.1 and received a downward departure.

8) To further show that the Movants Assistance was a valuable weapon to the government, please see Exhibit D. This letter was received today 4/30/07. The government now wants the Movant to continue

(2)

to furnish information, when the Movant was the source of information that brought Mr. Baden to justice

9) The Movant will gladly co-operate after the government honors the Plea Agreement And files a motion for a 5K1.1 downward departure, in behalf of Movant Richard Adjei.

For the foregoing reasons the Movant moves the Honorable Court to grant this motion And correct the Movants sentence using FRCr.P Rule 35(a).

Respectfully Submitted

Richard Adjei #05082-015
FDC Philadelphia
P.O. Box 562
Philadelphia, Pa. 19106

(3)

## CERTIFICATE OF SERVICE

I, Richard Adjei   acting pro-se, hereby certify that a true and
correct copy of the foregoing pleading was mailed to all parties of record,
via first class U.S. mail, this ___30th___ day of ___April___, 2007.

Richard Adjei

cc: AUSA : Beth Moskow - Schnoll
U.S. Attorney's Office
1007 Orange Street
7th Floor
Wilmington, De. 19899


Defense Attorney,
Mark S. Greenberg
1429 Walnut St. 13th Fl.
Philadelphia, Pa. 19102

(4)

# Exhibits

A- Plea Agreement - - - - - - - - 1 - 10

B- Proffer Session - - - - - - - - - 11 - 15

C- Proffer Session - - - - - - - - - 16 - 19

D- Letter Pertaining to Proffer - - - - - 20 - 21

$Exhibit$ A

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : |
| v. | : Criminal Action No. 06-55-GMS |
| RICHARD ADJEI, a/k/a JOHNSON AGYEMAN, | : |
| Defendant. | : |

## MEMORANDUM OF PLEA AGREEMENT

Pursuant to discussions between the United States of America, by and through its

attorney, Beth Moskow-Schnoll, Assistant United States Attorney for the District of Delaware,

and on behalf of and with the consent and knowledge of Colm F. Connolly, United States

Attorney for the District of Delaware, and the defendant, Richard Adjei, by and through his

attorney, Mark Greenberg, Esquire, the following agreement is hereby entered into by the respec-

tive parties:

1.     The defendant, Richard Adjei, agrees to waive indictment and plead guilty to a

four count Information. Count One charges the defendant with bank fraud in violation of 18

U.S.C. § 1344 which carries a maximum penalty of 30 years imprisonment, 5 years supervised

release, a $1,000,000 fine and a $100 special assessment. Count Two charges the defendant with

aggravated identity theft in violation of 18 U.S.C. § 1028A. This statute is a penalty

enhancement that adds two mandatory, consecutive years to any sentence received for a

conviction for certain enumerated offenses, including bank fraud. Count Three charges the

defendant with engaging in monetary transactions in property derived from specified unlawful

*l*

activity in violation of 18 U.S.C. § 1957. The maximum penalties for this offense are 10 years imprisonment, 3 years supervised release, a fine of $250,000 or not more than twice the amount of the criminally derived property involved in the transaction (whichever is greater), and a $100 special assessment. Count Four charges the defendant with making false, fictitious, or fraudulent claims to an agency or department of the United States in violation of 18 U.S.C. § 287. The maximum penalties for this offense are 5 years imprisonment, 3 years supervised release, a $250,000 fine, and a $100 special assessment.

2.      The defendant understands that if there were a trial, the Government would have to prove the following elements with respect to Count One of the Information: (a) that on or about the dates set forth in the Indictment, there was a scheme to defraud a bank; ( b) that the defendant executed the scheme with the intent to defraud the bank; and (c) that at the time of the execution of the scheme, the bank had its deposits insured by the Federal Deposit Insurance Corporation or FDIC. The defendant understands that if there were a trial, the Government would have to prove the following elements with respect to Count Two of the Information: (a) the defendant knowingly used, without lawful authority, a means of identification of another person; and (b) the defendant used the means of identification of another person during and in relation to bank fraud. The defendant understands that if there were a trial, the Government would have to prove the following elements with respect to Count Three of the Information: (a) the defendant engaged in a monetary transaction in or affecting interstate commerce; (b) the monetary transaction involved criminally derived property in a value greater than $10,000; (c) the property was derived from specified unlawful activity; (d) the defendant acted knowingly, that is, with knowledge that the transaction involved proceeds of a criminal offense; and (e) the

2

transaction took place in the United States. The defendant understands that if there were a trial, the Government would have to prove the following elements with respect to Count Four of the Information: (a) the defendant made or presented a claim to a department or agency of the United States for money or for property; (b) the claim was false, fictitious or fraudulent; and (c) the defendant knew at the time that the claim was false, fictitious or fraudulent.

3.   The defendant knowingly, voluntarily, and intelligently admits the following facts: (a) from in or around November 2005, through in or around April 2006, the defendant filed 175 false, fictitious and fraudulent tax returns with the Internal Revenue Service seeking refunds from the United State Treasury; (b) the tax returns were false, fictitious and fraudulent both because the defendant filed the returns using the names and Social Security Account Numbers of individuals without their consent and knowledge and because the returns contained false and fictitious information; (c) between on or about January 10, 2006, and on or about March 6, 2006, the defendant, operating as Auskwat Services, submitted sixty-six returns and corresponding refund anticipation loan (RAL) applications to HSBC Bank, a federally insured financial institution, using the names and Social Security Account Numbers of individuals without their knowledge or permission; (d) between on or about January 13, 2006, and on or about February 4, 2006, the defendant, operating as Auskwat Services, submitted thirty-two returns and corresponding RAL applications to Bank One, a federally insured financial institution, using the names and Social Security Account Numbers of individuals without their knowledge or permission; (e) between on or about January 19, 2006, and on or about January 21, 2006, the defendant, operating as Auskwat Services, submitted twenty-two returns and corresponding RAL applications to SBB&T, a federally insured financial institution, using the names and Social

3

Security Account Numbers of individuals without their knowledge or permission; (f) the defendant received the proceeds of the RALs issued by HSBC, Bank One, and SBB&T to the purported clients of Auskwat and did not pay the proceeds to the taxpayers listed on the fraudulent returns; and (g) on or about March 21, 2006, the defendant purchased a 2004 Toyota 4Runner from a car dealership in New Hampshire using more than $10,000 of money that he had derived from his fraudulent tax refund and bank fraud scheme.

4.    The defendant understands that at sentencing the District Court must consider the United States Sentencing Guidelines and take them into account in exercising its discretion to determine the appropriate sentence and must also consider the other factors bearing on an appropriate sentence pursuant to 18 U.S.C. § 3553(a). The parties hereby agree that U.S.S.G. §§ 2B1.1 and 2S1.1 are applicable to the offenses to which the defendant is pleading guilty and further agree and stipulate that, including relevant conduct pursuant to U.S.S.G. § 1B1.3, the defendant filed tax returns with the Internal Revenue Service seeking $1,057,496 in fraudulent refunds. The defendant further understands that the Government likely will recommend that the Court impose a sentence consistent with the sentencing range set forth by the sentencing guidelines.

5.    The defendant agrees to pay the special assessments at the time of sentencing. Should he fail to do so, the defendant agrees to voluntarily enter the United States Bureau of Prisons' administered program known as the Inmate Financial Responsibility Program through which the Bureau of Prisons will collect a portion of the defendant's prison salary and apply it on the defendant's behalf to the payment of the outstanding debt ordered.

6.    Provided that the United States Attorney does not subsequently learn of conduct

4

by the defendant inconsistent with acceptance of responsibility, at sentencing, the United States agrees to move for a three level reduction under USSG §3E1.1(b) based on the defendant's conduct to date.

7.    At the time of sentencing, the Government agrees to move to dismiss the Indictment that was returned against the defendant on May 11, 2006.

8.    The parties reserve the right to defend the probation officer's findings at the sentencing hearing and to defend the sentencing court's rulings at any subsequent proceedings, including any appeal. The parties realize that the Court is not bound by any stipulations reached by the parties. The defendant understands and agrees that if the Court decides not to follow any stipulation or recommendation in this Memorandum of Plea Agreement, or if the defendant does not receive the benefits he expects from any such stipulation or recommendation, the defendant may not withdraw his guilty plea.

9.    The defendant agrees to identify all assets over which the defendant exercises or exercised control, directly or indirectly, within the past two years, or in which the defendant has or had during that time any financial interest. The defendant agrees to take all steps as requested by the United States to obtain from any other parties by any lawful means any records of assets owned at any time by the defendant. The defendant agrees to undergo any polygraph examination the United States may choose to administer concerning such assets and to provide and/or consent to the release of the defendant's tax returns for the previous five years. Defendant agrees to forfeit to the United States all of the defendant's interests in any asset of a value of more than $1,000 that, within the last two years, the defendant owned, or in which the defendant maintained an interest, the ownership of which the defendant fails to disclose to the United States

5

in accordance with this agreement.

10.     The defendant agrees to forfeit all interests in any fraud related asset that the

defendant currently owns, has previously owned or over which the defendant currently, or has in

the past, exercised control, directly or indirectly, and any property the defendant has transferred,

as well as any property that is traceable to, derived from, fungible with, or a substitute for

property that constitutes the proceeds of his offense, including but not limited to the following

specific property:

(a)     $8,351 in U. S. currency that was seized during the search of his home on

April 13, 2006;

(b)     the contents of WSFS Bank checking account number 208368332; and

(c)     the contents of WSFS Bank savings account number 497145860.

Defendant warrants that defendant is the sole owner of all of the property listed above, and agrees

to hold the United States, its agents and employees harmless from any claims whatsoever in

connection with the seizure or forfeiture of property covered by this agreement.

11.     The defendant further agrees to waive all interest in any such asset in any

administrative or judicial forfeiture proceeding, whether criminal or civil, state or federal. The

defendant agrees to consent to the entry of orders of forfeiture for such property and waives the

requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the

forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and

incorporation of the forfeiture in the judgment. Defendant acknowledges that he understands that

the forfeiture of assets is part of the sentence that may be imposed in this case and waives any

failure by the court to advise him of this, pursuant to Rule 11(b)(1)(J), at the time his guilty plea

6

is accepted.

12.     The defendant further agrees to waive all constitutional and statutory challenges in

any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried

out in accordance with this Plea Agreement on any grounds, including that the forfeiture

constitutes an excessive fine or punishment. The defendant agrees to take all steps as requested

by the United States to pass clear title to forfeitable assets to the United States, and to testify

truthfully in any judicial forfeiture proceeding. Defendant acknowledges that all property

covered by this agreement is subject to forfeiture as proceeds of illegal conduct.

13.  ·    The defendant agrees to cooperate fully and truthfully with the Government as

follows:

a.      Defendant agrees to provide truthful, complete and accurate information

and testimony. The defendant understands that if he testifies untruthfully in any material way he

can be prosecuted for perjury. The defendant understands that if his prior statements to the

Government are untruthful in any material way this agreement is violated and becomes void.

b.      Defendant agrees to provide all information concerning his knowledge of,

and participation in, the subject matter of the Indictment and/or Information of which he has

knowledge.

c.      Defendant agrees that he will not falsely implicate any person or entity,

and he will not protect any person or entity through false information or omission.

d.      Defendant agrees to testify as a witness before any Grand Jury, hearing, or

trial when called upon to do so by the Government.

e.      Defendant agrees to hold himself reasonably available for any interviews

7

as the Government may require.

f. Defendant agrees to provide all documents or other items under his control or which may come under his control which may pertain to any crime.

g. Defendant understands that his cooperation shall be provided to any law enforcement agency as requested by counsel for the Government.

h. To enable the Court to have the benefit of all relevant sentencing information, the defendant waives any rights to a prompt sentencing, and will request that sentencing be postponed until his cooperation is complete.

i. Defendant agrees and understands that this agreement requires that his cooperation may continue even after the time that the defendant is sentenced. Failure to continue to cooperate after sentence is imposed shall be grounds to void this agreement.

j. Defendant agrees that if the Government determines that the defendant has not provided full and truthful cooperation, or has committed any federal, state, or local crime, other than violations or traffic offenses, between the date of this agreement and his sentencing, or has otherwise violated any other provision of this agreement, the agreement may be voided by the Government and the defendant shall be subject to prosecution for any federal crime which the Government has knowledge including, but not limited to, perjury, obstruction of justice, and the substantive offenses arising from this investigation.

14. If the Government in its sole discretion determines that the defendant has fulfilled his obligations of cooperation as set forth above, at the time of sentencing, the Government will:

a. Make the nature and extent of the defendant's cooperation known to the Court.

8

b. ⚡ Make a motion to allow the Court to depart from the Sentencing Guidelines pursuant to Sentencing Guideline §5K1.1, 28 U.S.C. §994(n), and 18 U.S.C. §3553(e), only if the Government, in its sole discretion, determines that the defendant has provided substantial and truthful assistance in the investigation or prosecution of another person who has committed an offense. The defendant understands that his debriefing and cooperation have not yet been completed and that a debriefing does not amount to substantial assistance.

c.   Make whatever sentencing recommendation the Government deems appropriate.

15.   The defendant's rights under this agreement shall in no way be dependent upon or affected by the outcome of any case in which he may testify.

16.   It is further agreed by the parties that this Memorandum supersedes all prior promises, representations, and statements of the undersigned parties; that this Memorandum may be modified only in writing signed by all the parties; and that any and all promises, representations and statements made prior to or after this Memorandum are null and void and

/     /     /     /

9

have no effect whatsoever, unless they comport with the subsequent written modification

requirements of this paragraph.

                                            COLM F. CONNOLLY
                                            United States Attorney

                              BY:_____

Richard Adjei                               Beth Moskow-Schnoll
Defendant                                   Assistant United States Attorney

Mark Greenberg
Attorney for Defendant

Dated:

**AND NOW,** this $\underline{\text{16}}$ day of $\underline{\text{November}}$, 2006, the foregoing Memorandum of

Plea Agreement is hereby (accepted) (rejected) by this Court.

                                            HONORABLE GREGORY M. SLEET
                                            United States District Court Judge

10



**U.S. Department of Justice**

 Exhibit B

*United States Attorney's Office*
*District of Delaware*

---

*Nemours Building*                    *(302) 573-6277*
*1007 N. Orange Street, Suite 700*    *FAX (302) 573-6220*
*P.O. Box 2046*
*Wilmington, Delaware 19899-2046*

October 16, 2006

Mark Greenberg, Esquire
LaCheen Dixon Wittels & Greenberg LLP
1429 Walnut Street, 13th Floor
Philadelphia, PA 19102

> **Re:    United States v. Richard Adjei**
> **Criminal Action No. 06-55-GMS**

Dear Mr. Greenberg:

As requested, I have enclosed reports pertaining to both proffer sessions held with your client. Please contact me if you have any questions.

Very truly yours,

COLM F. CONNOLLY
United States Attorney

BY:

Beth Moskow-Schnoll
Assistant United States Attorney

## Internal Revenue Service
## Criminal Investigation



# Memorandum of Interview

---

**In Re:**       RICHARD YAW ADJEI          **Location:**   Federal Building
                                                            Wilmington, DE

**Investigation #:**   520630162
**Date:**              May 18, 2006
**Time:**              12:00 PM
**Participant(s):**    RICHARD YAW ADJEI, Interviewee
                       Joseph Bondy, Attorney
                       Beth Moskow-Schnoll, AUSA
                       James Danz, United States Postal Inspector

On the above date and time Special Agent (S/A) Antonino Lo Piccolo participated in a
proffer session between RICHARD YAW ADJEI and the Government. ADJEI provided
the following information during this proffer session:

1. ADJEI prepared returns for the 2004 tax year using information provided by an
   acquaintance from New York City's Ghanaian community, named Mahmoud.
   The information consisted of a list of names, social security numbers, and date
   of births. He used this information to create false Schedule C's and tax returns.
   Mahmoud instructed him to report income and expenses in a certain dollar
   range in order to generate a refund of around $2,500. ADJEI chose income
   and expense amounts according to Mahmoud's guidance and received no
   information relating to the actual income and expenses of the persons
   appearing on Mahmoud's lists. Mahmoud further advised ADJEI to avoid
   drawing attention by not seeking a refund above a certain amount.

2. ADJEI stated 15% to 20% of last year's returns were filed for legitimate
   customers, whom he actually knew or managed to attract on his own and for
   whom he received a Form W-2. The rest he prepared with the use of the
   information Mahmoud furnished. ADJEI accepted the information because he
   was eager to generate income from his tax return business called Rydex
   Ventures, which he started in 2004. The information was presented on yellow-
   lined notebook paper. Mahmoud and ADJEI agreed to split the refund checks.
   ADJEI printed the checks and Mahmoud handled the cashing of the checks.
   However, a majority of the returns filed did not result in the issuance of a check.
   Mahmoud lives somewhere in the Jamaica, Queens area of New York, though
   he is frequently in the Bronx. Mahmoud drives a dollar van (bootleg bus

service).

3. ADJEI used Mahmoud's information that pertained to dependents again for the 2005 tax year. ADJEI drew the dependent information from printouts of the 2004 return information stored on his computer. He obtained the primary social security numbers associated with most of the false returns he filed for 2005 from a female known to him as Danyell Williams. Williams used to live near Fox Run and has a 10 or 11 year old son. He recalled dropping her off at a brick row home near the Elmsere Bridge, where he believed her aunt lived

4. ADJEI characterized his relationship with Williams as a brief fling. A friend of hers introduced them to each other sometime around Christmas. She mentioned she had access to personal information at work. ADJEI does not know the name or location of where she works, however he believes her work relates to collecting bills for hospitals and that she works somewhere in Delaware. He recalls she made a statement to the effect that "They just got a new hospital added to their list at work". Williams patronizes a club called Pharaohs, and she may work somewhere near the club.

5. S/A Lo Piccolo showed ADJEI a patient registration record, bearing the name James Grace, found in his residence during a search warrant. ADJEI verified Williams gave him hundreds of similar documents, which contained the personal information he used to prepare false tax returns. Starting in January, Williams supplied him documents on multiple occasions. He last spoke with Williams a couple of days prior to his arrest. He did not tell her how he intended to use the information the documents contained.

6. ADJEI gave Williams approximately $2,500 in cash and a stored value card of about the same value. Williams used this money to buy a 1997 cream colored Nissan Ultima. She previously drove an old Grand Cherokee or similar type vehicle, which broke-down. ADJEI occasionally gave her cash for groceries and purchased clothing for Williams. He also recalled sending her a $500 wire through Western Union.

7. S/A Lo Piccolo showed ADJEI records from INOVA HEALTH SYSTEMS found in his residence during a search warrant. ADJEI stated he acquired these records from a person in the Bronx named Jude Baden.

8. ADJEI gave approximately 30 to 40 refund checks to a friend of his name David Dosoo. Dosoo lives in the vicinity of Boston Road and Coldon Avenue in the Bronx, New York. Dosoo kept 5% for arranging the cashing of these checks. Whoever cashed the check charged 25% and ADJEI got 70%. ADJEI did not know who cashed the checks given to Dosoo. He gave Dosoo most of the checks in New York, but a few times he gave him checks in Delaware. Dosoo's car is registered at 220 N. Antlers Place, but he never lived there.

9. ADJEI gave 5 or 6 Santa Barbara Bank & Trust checks to Mahmoud to cash. He made copies of this checks prior to given them to Mahmoud.

10. ADJEI also gave checks to a Francis Duah, who he knows as Jimmy for cashing.

11. Micah Bruce is an acquaintance of his. ADJEI suggested that Bruce start a tax return business and offered to help Bruce. ADJEI offered this assistance because Bruce frequently asked to borrow money from him and he thought Bruce would benefit from the preparation fees. ADJEI showed Bruce how to obtain an EFIN and Bruce knew he was using the EFIN to file returns, because they had conversations about ADJEi filing returns. However, Bruce had no knowledge that the returns were fraudulent. ADJEI intended to give Bruce some money, but he never did. ADJEI used both EFINs 755160 (Auskwat Services) and 130168 (Rydex Ventures) because he wanted to spread the returns among two EFINS to increase the total number of returns he could file.

12. ADJEI knows other people who use people to obtain EFINs and then use the EFINs to file returns. He used to be around people who filed returns but he did not start filing until he got his own EFIN. He never used an EFIN other than Bruce's or his own.

13. ADJEI filed paper returns using the information acquired from Baden because the electronic filing season had not started. The first person using the information is the first person to receive a refund check. Therefore, he filed by paper to ensure his return was the first return received by the IRS. ADJEI stated that Baden and Mahmoud may also sell the same information he purchased to others.

14. ADJEI knows Abubakar Adeyi. He used Adeyi's identity without his knowledge to rent 220 N. Antler's Place because he had applications denied at other locations due to a bad credit history.

Antonino Lo Piccolo
Special Agent

I prepared this memorandum on May 31, 2006, after refreshing my memory from notes made during and immediately after the interview with RICHARD YAW ADJEI.

Antonino Lo Piccolo
Special Agent

/5-

*Exhibit C*

## MEMORANDUM OF INTERVIEW

| | | |
|---|---|---|
| CASE NUMBER | : | 0589-1578437-MT(1) |
| PERSON INTERVIEWED | : | Richard Adjei |
| PLACE OF INTERVIEW | : | U. S. Courthouse<br>District of DE |
| DATE OF INTERVIEW | : | June 7, 2006 |
| TIME OF INTERVIEW | : | 12:00 p.m. to 2:30 p.m. |
| INTERVIEWED BY | : | A. Lo Piccolo, IRS CID<br>J. Danz, Postal Inspector |

Richard Adjei was interviewed at the above place and time regarding his knowledge of and participation in an identity theft/income tax fraud scheme. The interview was a continuation of a proffer session begun on 5/18/06. The proffer was also attended by AUSA Beth Moskow-Schnoll and Defense Counsel Joseph Bondy.

Adjei stated he met Danyell Williams sometime around December 2005. Adjei stated he was introduced to Williams by David Dosoo, who was dating Tamica LNU, a friend and co-worker of Williams. Adjei stated he did not know Tamica well, but stated that she had been to his apartment on one occasion to berate him for getting a ticket in New York while driving a car Tamica had rented for him in her name. Adjei stated he had Tamica rent the car for him because he did not have a credit card of his own for the rental.

Adjei stated when he initially met Williams he did not know where she worked. Adjei stated Williams getting him people's personal information just came up in conversation when he asked her if she knew anyone that could get him access to people's names and social security numbers. Adjei stated after meeting with Williams two or three times, and discovering she had access to personal information, he asked her to provide him with information. Adjei stated Williams never asked him what he was going to do with the information, and further stated he did not offer Williams any money or goods for getting him the information. Adjei stated as time went on, Williams learned that he was making money from the information she provided him, but further stated Williams did not know exactly what he was doing. Adjei stated at one point, while Williams was at his apartment, she saw numerous check stubs. Adjei stated he then told Williams he was making money by printing checks.

Adjei stated Williams continued to provide him information even after she learned he was using the information to print checks. Adjei stated Williams provided him stacks of computer generated sheets of information on three or four occasions,

*/6-*

further stating the last time being approximately two weeks before he was arrested. Adjei stated he received a total of approximately 300 sheets of information and attempted to use approximately 150 of the records. Adjei stated some of the information Williams provided was older, but some was current. Adjei stated he only used the information of victims in the age range of approximately 30 to 48 years old, further stating he felt uncomfortable using the information of elderly people.

Adjei stated he gave Williams a stored value card he received as a result of his income tax fraud scheme which she was to use to purchase a car for herself. Adjei stated he wrote the PIN on the card himself before he gave it to Williams. Adjei stated he also wired $500.00 to Williams through Western Union in March 2006 so she could visit New York with a relative.

Adjei stated he has known David Dosoo for approximately three years. Adjei stated Dosoo knew he was running a fraudulent income tax scheme from overhearing Adjei in conversation with other Ghanians. Adjei stated Dosoo did not, however, know he was getting information for the fraud scheme fro Williams. Adjei stated Dosoo approached him in January 2006, advising he could get someone to cash the checks Adjei received as a result of the scam. Adjei stated he would call Dosoo when he had checks ready to be cashed. Adjei stated he would never endorse the checks before giving them to Dosoo. Adjei stated he did not know exactly what Dosoo did to cash the checks, but stated Dosoo told him he knew someone that either owned or worked a check cashing agency. Adjei stated a few days after he gave Dosoo checks to cash, Dosoo would return with the money. Adjei stated Dosoo received approximately 5% of the value of the checks, but further stated Dosoo's connection would take between 40% and 50% of the value of the checks for cashing them.

Adjei stated others to whom he gave checks to cash from the fraud scheme included Mahmoud, aka Frank Boatke, and James Duah. Adjei stated Mahmoud and Duah were both introduced to him by Jude Baden. Adjei stated he only gave Mahmoud SBB&T checks to cash, but further stated Mahmoud did not get all of the SBB&T checks. Adjei stated all of the U. S. Treasury checks he received as a result of the scam went to Duah, with the exception of five or six that remained at his apartment until the day he was arrested. Adjei stated he also gave Duah some HSBC checks to cash. Adjei stated Jude Baden was running the same type of scam he was.

Adjei stated Duah's only role in the scheme was to cash the checks, further stating, "that's all he does". Adjei stated Duah did not ask where Adjei was getting the checks, but further stated he knew where they were coming from. Adjei stated he did not endorse any of the checks before giving them to Duah, but further stated he made copies of the checks and notated how much money he expected back from each check and to whom he gave each check. Adjei stated Duah received approximately 30% of the value of each check he cashed for him. Adjei stated he would meet Duah at different locations in the Bronx to drop off the checks and subsequently pick up the cash associated with the checks. Adjei stated Duah currently owes him approximately $30,000.00 for checks he gave Duah before he

was arrested. Adjei stated before he was arrested, he was advised, through Jude Baden, that the money for those checks was ready to be picked up, but further stated once they realized he was in jail, Baden or Duah advised the checks were cancelled and the money was taken back from them.

Adjei stated it is no secret in New York that he is in custody. Adjei stated people are calling his girlfriend to find out how they can help.

Adjei stated he has known Jude Baden for approximately two years. Adjei stated Bade is very open about his fraudulent income tax scheme and how much money he makes from it. Adjei stated he purchased information from Baden on one occasion, further stating it consisted of approximately 70 to 100 records from Virginia. Adjei stated he met baden and another black male at a restaurant called "Papaye" a few weeks after he got the information. Adjei stated at that time he paid Baden $500.00 for all of the information. Adjei stated he believes Baden has been arrested in the past two years by the Connecticut State Police. Adjei believes Baden went to jail and returned to New York after his release. Adjei stated Baden lived on Gunhill Road in the Baychester area of New York and hangs out at "Africico", a restaurant in the Parkchester area of the Bronx. Adjei stated Baden owns a black BMW, which he purchased from Skyline, a New Jersey auctioneer.

Adjei stated he does not know anyone by the name Anane. Adjei stated he does know someone by the name Kowakiu(spelling?), but does not know his last name. Adjei stated Kowakiu was arrested a few years ago by federal agents in New York for running the same type of scam as Adjei.

Adjei stated the only person to whom he gave a stored value card was Danyell Williams, further stating he accidentally shredded a few of them. Adjei stated he had no help filing fraudulent tax returns for tax year 2005. Adjei stated Mahmoud gave him guidance on how to run the scam in the 2004 tax year, but further stated he, himself, was the only one entering information onto the fraudulent returns.

Adjei was shown bank photos of a black male making transactions at WSFS and a black female making transactions at Commerce Bank, but was unable to identify either of the individuals. Adjei was shown photos of individuals by the name Frimpong, Adeniji, Owusu and Hooper, but was unable to identify any of them.

Adjei was shown a photocopy of a check with a New York address. Adjei stated he knew a girl named "Fruitjuice" that used to live at that address. Adjei stated he learned how to open the bank of mail boxes at that address without using the mailman's key. Adjei stated he used the address to file a false tax return, tracked when the refund check would be mailed, then waited for the check to arrive. Adjei stated once he knew the check was delivered, he got someone to buzz him in the front door, then opened the bank of mailboxes and took the check out of the mailbox. Adjei stated he did not do this very often, further stating he could not recall if he cashed the above mentioned check himself or not.

When asked about "Anita", Adjei stated his girlfriend has a friend named Anita. Adjei stated he has a brother named Felix who has been deported several times.

Adjei stated he also has a brothernamed Tabi Agye, but stated he did not want to talk about Tabi. Adjei was asked if he knew Samuel Andrews, Nano Antikara, Joseph Mensah, Sean Mensah, Elvis Boumah, Pamela Higgins, Elvis Quiocoe or Eric Amankwah. Adjei stated he knew a Sean, but was unsure of his last name, further stating he did not recognize any of the other names.

Adjei stated he does not know of anyone else from whom he could get the type of information he received from Danyell Williams and Jude Baden. Adjei stated the going rate for this type of information could be as much as $50.00 to $100.00 for each name.

At the conclusion of the interview, Adjei signed PS Form 8193, Consent to search, allowing Agents access to his apartment at 220 N. Antlers Place, Bear, DE 19701.

J. Danz

06/13/2006

U.S. Postal Inspector

Date

$Exhibit\ D$

# LaCheen Dixon Wittels & Greenberg LLP

### Attorneys and Counsellors at Law

Stephen Robert LaCheen*
Anne M. Dixon
Barnaby C. Wittels
Mark S. Greenberg**

* member pa and fl bars
** member pa and nj bars

1429 Walnut Street, 13th Floor
Philadelphia, Pennsylvania 19102

(215) 735-5900
Fax (215) 561-1860

George E. Goldstein
(1936-1997)

April 23, 2007

AUSA Beth Moskow-Schnoll
U.S. Attorney's Office
1007 Orange Street
7th Floor
Wilmington, DE 19899

Re: <u>United States v. Richard Adjei</u>

Dear Ms. Schnoll:

I spoke at some length today with Special Agent Susan Stevens of the IRS in Orlando, Florida. Agent Stevens inquired whether Mr. Adjei would provide additional information about Jude Baden, an individual Agent Stevens told me Mr. Adjei had provided information about in a past proffer. Agent Stevens further advised that the prosecution of Mr. Baden had been "dropped" because of a different case Agent Stevens had been working on. It appears that the case against Mr. Baden has been reopened.

I explained to Agent Stevens the circumstances surrounding Mr. Adjei's sentencing in Delaware and the decision of the government not to file a 5K1.1. motion for downward departure. I told Agent Stevens that it was unlikely the Mr. Adjei would cooperate under the present circumstances but that the government had one-year from the date sentence was imposed to file a Rule 35(b) motion should circumstances change. She advised that she would contact ~~the~~ Agent Piccolo and that AUSA Karen Gable in Orlando may reach out to you.

Please let me know if you anticipate that something can come of this phone conversation.

LaCheen Dixon Wittels
   & Greenberg LLP

Very truly yours,

MARK S. GREENBERG

cc: Mr. Richard Adjei

21-



U.S.M.S.
AIR-X

United States District Court
of Delaware at Wilmington
844 Kings Street
Wilmington De 19801

FEDERAL DETENTION CENTER
PHILADELPHIA
P O BOX 562
PHILADELPHIA PA 19105

DATE
THE ENCLOSED LETTER WAS PROCESSED THROUGH
SPECIAL MAILING PROCEDURES FOR FORWARDING TO
YOU. THE LETTER HAS NEITHER BEEN OPENED NOR
INSPECTED. IF THE WRITER RAISES A QUESTION OR
PROBLEM OVER WHICH THIS FACILITY HAS JURIS-
DICTION, YOU MAY WISH TO RETURN THE MATERIAL
FOR FURTHER INFORMATION OR CLARIFICATION. IF
THE WRITER ENCLOSES CORRESPONDENCE FOR
FORWARDING TO ANOTHER ADDRESSEE, PLEASE RETURN
THE ENCLOSURE TO THE ABOVE ADDRESS.

Legal Mail